Argued and submitted March 31, affirmed August 12, petition for review denied
December 12, 2009 (347 Or 365)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## STEVEN CHRISTOPHER SHAW,
*Defendant-Appellant.*

Lane County Circuit Court
210709791; A136471

215 P3d 105

Kristin A. Carveth, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Carson, Senior Judge.

BREWER, C. J.

**BREWER, C. J.**

Defendant challenges his conviction for felon in possession of a restricted weapon, ORS 166.270, and carrying a concealed weapon, ORS 166.240, arguing that his consent to the search of his person was the product of an illegal stop. Defendant also asserts that the trial court erred by denying his motion for a judgment of acquittal on the carrying a concealed weapon charge because he was entitled, under Article I, section 27, of the Oregon Constitution, to possess a concealed butterfly knife while in his front yard. We affirm.

We first address defendant's argument that the trial court erred when it denied his motion under Article I, section 9, of the Oregon Constitution to suppress the butterfly knife found in his pocket after he consented to a search of his person.[1] The trial court found the following facts, which, because they are supported by evidence, we are bound to accept. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

> "[O]n April 12th of 2007, the officers had received a dispatch regarding an anonymous tip regarding animal abuse and they responded to the Avalon Street address to investigate that.
>
> "After some examination of the premises, Officer Nicol encountered the defendant as he was exiting the front of his house and heading towards the street. He asked the defendant if he would come over and talk to them. The defendant complied. While still on the property, the officer noticed that the defendant was carrying something in his right hand, asked the defendant what it was. The defendant responded that it was tools.
>
> "The officer asked defendant to show him, whereupon the defendant showed the tools and saw that it was a screw driver, a hammer, and a wrench. He asked him to put the tools down, which he did. I believe the officer also asked him to show his hands at that time, which he did.
>
> "After setting down the tools, the officer asked the defendant if he had any other weapons, and he responded, Yes, I have a knife in my pocket. The officer asked him if he minded if he would retrieve the knife from his pocket, and

---

[1] Defendant does not advance an argument under the Fourth Amendment to the United States Constitution.

the defendant consented. The officer did retrieve the knife from the pocket and discovered that it was a butterfly knife, which is a restricted weapon."

In response to defendant's motion to suppress the knife, the prosecutor argued that the encounter between the officer and defendant was not a "stop," because the officer questioned defendant in a relaxed, conversational tone and thus did not significantly interfere with defendant's liberty. According to the prosecutor, the officer's request for consent to a search did not require that a stop be ongoing or that the officer have reasonable suspicion that defendant had committed a crime. In the prosecutor's view, the dispositive question was whether the encounter was a lawful one; if it were, the officer was authorized to request defendant's consent to a search for weapons. The prosecutor also argued that, because the officer sought defendant's consent to the search instead of conducting an involuntary patdown, the officer did not need to have any particularized concern for his safety when he made the request.

Defendant countered that, each step of the encounter—from the initial request to talk through the request for consent to search—violated his rights under Article I, section 9, because each step constituted an unlawful "stop" in the absence of reasonable suspicion that he had committed a crime. Moreover, defendant argued, the officer could not have relied on the "officer safety" doctrine set out in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987), to justify his requests because that doctrine applies only during the course of a "lawful stop," and, here, defendant argued, he had been unlawfully stopped when the officer asked him to come over and talk.

The trial court then found that

"the request by the officer that the defendant talk to them and the defendant's compliance with that did not amount to a stop and that the request that the defendant show him what was in his hands did not constitute a stop and that when the defendant was asked if * * * the officer could look in his pocket for the knife and he complied with that, that that also did not constitute a stop, that the defendant was at all times free to not comply with the officer's requests

and not comply with the search—the request for consent to search."

The court went on to conclude:

> "I think had the—had there been a search without consent, we might have a different issue. But it seems to me that there's nothing about requiring—or requesting the consent to search that would suggest that a stop had occurred. * * *

> "And so the Court will rule that there was no stop and there was no unlawful search and that the motion to suppress should, therefore, be denied."

Defendant renews his arguments on appeal.

Defendant's interaction with the officer can be broken down into four parts, each implicating different aspects of the analysis of police/citizen encounters under Article I, section 9. The trial court determined that defendant was not stopped at any point in the sequence; defendant argues otherwise. We examine each in turn.

## I. "[C]ould you come over here and talk to me for a second?"

The first contact between the officer and defendant occured when the officer, who was walking from behind the residence where he had seen the empty doghouse, heard the front door to the residence close. The officer looked around the corner of the residence and saw defendant walking across the lawn; he then asked defendant to "come over here and talk to me for a second." Defendant argues that he was "seized" when the officer "asked him to show his hands." Defendant argues that the initial encounter, viewed in the totality of the circumstances, contributed to his being seized because the officer asked defendant, who was walking in the opposite direction, to come over and speak with him and to alter his path of travel.[2] We disagree.

██ Under *State v. Holmes*, 311 Or 400, 407-10, 813 P2d 28 (1991), there are three legally significant categories of encounters between police officers and citizens. The first is

---

[2] Defendant does not argue that the location of the encounter—his front lawn—changed the character of the encounter in any way.

"mere conversation," which encompasses consensual inter-actions between police officers and citizens that require no justification. The second category, temporary restraints on liberty for investigatory purposes, are "seizures" under Article I, section 9, that must be justified by a reasonable sus-picion of criminal activity. The third category consists of arrests, which also are "seizures" under Article I, section 9, and must be justified by probable cause. As explained in *Holmes*, a person is "seized" for purposes of Article I, section 9, when either (1) a police officer intentionally and signifi-cantly interferes with a person's liberty of movement, or (2) a person believes that his or her liberty of movement has been so restricted and such a belief is objectively reasonable under the circumstances. *Id.* at 410. A determination of whether or when a defendant has been seized involves a fact-specific inquiry into the totality of the circumstances surrounding the encounter. *Id.* at 408-10.

■■ The first part of the encounter between defendant and the officer falls into the "mere conversation" category. The Supreme Court's analysis in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), is instructive. There, the court considered whether the initial contact between an officer and the defen-dant constituted a "seizure" under *Holmes*. The court explained:

> "In this case, [Officer] Deese's initial actions of stopping his vehicle next to defendant and then gesturing for defendant to approach him did not intrude upon defendant's liberty of movement, because, even if Deese inconvenienced defen-dant, his actions did not constitute a show of authority involving conduct 'significantly beyond that accepted in ordinary social intercourse.' *Holmes*, 311 Or at 410. When Deese took defendant's identification card and radioed the police dispatch for a warrant check, however, the consen-sual nature of that encounter dissipated, and the encounter evolved from a 'mere conversation' encounter into a restraint upon defendant's liberty of movement."

*Hall*, 339 Or at 19. That reasoning applies here as well. Here, the officer asked defendant, who was walking away from him, to come over and speak with him. The officer did not order defendant to stop or order defendant to speak to him,

and the officer did not otherwise engage in a show of authority that would have indicated to defendant that he had no choice but to talk to him. Indeed, the first interaction was even more conversational than were the events in *Hall*: Here, the officer was on foot and made an oral request in a conversational tone. It is true that "[a]n officer's conduct *may* significantly interfere with an individual's liberty and freedom of movement," and thus constitute a "stop," "if the individual is *forced* to alter his course of conduct or is summoned away from a task." *State v. Crandall*, 197 Or App 591, 595, 108 P3d 16 (2005), *rev'd on other grounds*, 340 Or 645, 136 P3d 30 (2006) (emphasis added). However, defendant here was not "forced" to alter his course of conduct. In short, the officer's request to speak with defendant while defendant was walking away from him did not constitute a "significant interference" with defendant's liberty. Accordingly, we reject defendant's contention that he was stopped when the officer requested that he come over and talk to him.

## II. "Hey, what's in your hand there?"

■ Immediately after asking defendant to come over and speak with him, the officer saw that "[defendant] was carrying an object and there was a little bit of shininess to it." The officer, unsure of what defendant had in his hands, asked defendant, "Hey, what's in your hand there?" Defendant argues that that question, viewed in the totality of the circumstances, contributed to his being "seized." Again, we disagree.

This point in the encounter is similar to an encounter between an officer and the defendant that we described in *State v. Turner*, 221 Or App 621, 191 P3d 697 (2008). There, the officer, mounted on a bicycle, observed the defendant, also mounted on a bicycle, cycling in a rally while carrying a "ninja sword" across his back. *Id.* at 623. The officer asked the defendant, "[W]hat's sticking out of your neck?" and the defendant replied, "[A] ninja sword." *Id.* Although we ultimately determined that the trial court had erred in denying the defendant's motion to suppress, we concluded that the initial question "[W]hat's sticking out of your neck?" did not constitute a stop. *Id.* at 625. We reach the same conclusion here: The officer's question did not amount to a seizure

because it did not "constitute a show of authority involving conduct significantly beyond that accepted in ordinary social intercourse." *Holmes*, 311 Or at 410 (internal quotation marks omitted). The officer here, like the officer in *Turner*, merely inquired as to what defendant was carrying.

III. "[A]t that point, * * * I told him to show me his hands."

After the officer asked him what he had in his hands, defendant replied that he was carrying tools. Defendant then "kind of raised it up and showed a little more clearly" and the officer "could see that they were tools." The officer testified, "At that point he kind of turned his hand up, you know, so I could actually see what was in his hand. And I spotted a screw driver, a hammer, and a pretty good sized wrench." The prosecutor asked the officer whether the tools defendant had "raise[d] any safety concerns for you?" The officer replied:

> "Not—well, it did because the hammer itself wasn't a standard hammer. I mean, I've seen hammers before. This one was slightly smaller than an average hammer, but it had like a pick tip on it. It was almost like a pick rather than an actual hammer like for nailing nails.

> "I mean just that one by itself made me go, [t]hat's not your average tool there. So at that point—you know—that's why I asked to see his—to see his—or told him to show me his hands."

Defendant identifies this point in his encounter with the officer as the moment he was seized. Defendant reasons that, in light of their prior interactions, when the officer asked him to show his hands, "[n]o reasonable person in defendant's position would believe that he could terminate the encounter without first complying with [the officer's] request to show his hands." Defendant further argues that the officer lacked reasonable suspicion that he had committed or was committing a crime and, thus, lacked any legal authority to seize him. Finally, defendant asserts that the seizure was not justified by officer safety concerns because the request that he show his hands did not occur during the course of a "lawful encounter."

■    In *Bates*, the Oregon Supreme Court set out the basic test for determining the lawfulness of a precautionary patdown by a law enforcement officer:

> "[W]e hold that Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present. * * * Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

304 Or at 524. Here, the officer's request that defendant show him his hands was not a precautionary patdown; however, because the officer effectively ordered defendant to show him his hands, this step in the encounter amounted to a seizure of defendant. *See State v. Ruiz,* 196 Or App 324, 327, 101 P3d 824 (2004), *rev den*, 338 Or 363 (2005) (holding that an officer stopped the defendant when he ordered the defendant to take his hand out of his pocket). Thus, the officer's actions must have been supported by a reasonable suspicion, "based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *Bates,* 304 Or at 524.

We have little difficulty concluding that the officer's actions fall squarely within the "officer safety" exception set out in *Bates*. As explained, the officer was engaged in "mere conversation" with defendant prior to ordering him to show his hands; mere conversation is one of the categories of "lawful encounters" the court described in *Holmes*, 311 Or at 410.[3] The officer testified that he was concerned for his safety when he saw that defendant was carrying, among other tools, a hammer. The step that the officer took to ameliorate that concern—ordering defendant to show him his hands, was reasonable under the circumstances as they appeared to the

---

[3] *State v. Peterson*, 164 Or App 406, 991 P2d 1104 (1999), is not to the contrary. There, we held that officer safety concerns cannot justify the *initiation* of a stop. *Id.* at 409. Here, the officer was already engaged in a lawful encounter with defendant at the time his concern for his safety arose.

officer and, indeed, was perhaps the least intrusive step he could have taken. Defendant was not unlawfully seized by the officer's order that he show his hands.

IV. "Hey, you know, do you have any other weapons on you?"

■　　　After the officer instructed defendant to place the tools he was carrying on the ground, the officer asked him, "Hey, you know, do you have any other weapons on you?" Defendant said, "I have a knife in my right front pocket." The officer then asked, "Hey, you don't mind if I * * * get that from your pocket[?]" and defendant said, "[N]o." The officer pulled the knife from defendant's pocket and

> "at that point realized * * * as soon as I pulled it out, I realized it was a butterfly knife, which I know by—the Oregon statutes * * * says that anything that uses centrifugal force to swing the blade into an open position is a restricted weapon."

The officer then held onto the knife and conducted a patdown of defendant to ensure that he was not carrying any other weapons. After completing the patdown, the officer asked defendant for his identification and called in a records check. While the check was being conducted, the officer asked defendant if he had ever been convicted of a felony, and defendant admitted that he had. The records check confirmed defendant's admission, and the officer cited him for felon in possession of a restricted weapon.

Defendant argues that his consent to the search that yielded the butterfly knife was the product of the exploitation of an unlawful seizure of his person. Defendant contends that, but for the illegal seizure, which occurred when the officer ordered him to show his hands, he would not have consented to the officer's request to search him for weapons. Because we have concluded that the officer's order to defendant to show his hands did not contravene Article I, section 9, we reject defendant's exploitation argument. Accordingly, the trial court did not err when it denied defendant's motion to suppress.

Defendant also assigns error to the trial court's denial of his motion for a judgment of acquittal. Defendant argued before the trial court, and now argues on appeal, that

Article I, section 27, of the Oregon Constitution guarantees him the right to carry a concealed butterfly knife while on his own property.[4] The state renews its argument before the trial court that, because the legislature has the authority to regulate the manner of possession of restricted weapons in public areas and because the lawn of a residence is an area where it is likely that an individual will come into contact with the public, Article I, section 27, does not bar the legislature from proscribing the possession of concealed weapons on the lawn of a residence. The trial court denied defendant's motion for a judgment of acquittal for substantially the same reasons that the state advocates before this court. We affirm, but on a different basis.

■ The "right for the wrong reason" doctrine permits a reviewing court, in its discretion, to affirm the ruling of a trial court on an alternative basis, but only when

"(1) * * * the facts of record [are] sufficient to support the alternative basis for affirmance; (2) * * * the trial court's ruling [is] consistent with the view of the evidence under the alternative basis for affirmance; and (3) * * * the record materially [is] the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below."

*Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). All three requirements of the "right for the wrong reason" doctrine are satisfied here, and we exercise our discretion to affirm the trial court's decision on the ground that defendant was a felon. Defendant admitted to being a felon and was convicted of the crime of being a felon in possession of a restricted weapon. At no point during the trial did defendant dispute his status as a felon. The trial court was aware of defendant's felon status when it denied his motion for a judgment of acquittal on the grounds that the prosecutor urged, and we perceive no way in which either the prosecutor or defendant would have developed the record differently had the prosecutor argued that defendant lacked

---

[4] Article I, section 27, provides that, "[t]he people shall have the right to bear arms for the defence [*sic*] of themselves, and the State, but the Military shall be kept in strict subordination to the civil power[.]"

any Article I, section 27, right at all because of his felon status.

It is settled that felons have no right under Article I, section 27, to possess, much less carry in a concealed manner, restricted weapons such as the butterfly knife at issue here. *See State v. Hirsch/Friend*, 338 Or 621, 679, 114 P3d 1104 (2005) (upholding ORS 166.270(1) against Article I, section 27, challenge). It follows that, whatever the proper contours of the Article I, section 27, right of a person to carry restricted weapons on his or her own property, an issue that we expressly do not decide here, defendant—by virtue of his felon status—lacked *any* such right. The trial court properly denied defendant's motion for a judgment of acquittal.

Affirmed.