Submitted February 17, reversed and remanded December 9, 2009

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# DENA IDELL MATHIS,
*Defendant-Appellant.*

Marion County Circuit Court
06C52083; A135489

222 P3d 39

James C. Jagger filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Sally L. Avera, Senior Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Carson, Senior Judge.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine. ORS 475.894.[1] She assigns error to the trial court's denial of her motion to suppress evidence derived from a consensual search of her purse and wallet. We review the trial court's denial of the motion to suppress for legal error, *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005), and reverse and remand.

We take the facts from the trial court's written findings of fact and, to the extent they are consistent with the trial court's ultimate conclusion, from the record. *Id.* Defendant was a passenger in a car that was stopped by Oregon State Police Troopers Simons and Lawson near the Oregon State Fairgrounds. Simons initiated the stop after he observed the driver commit several traffic violations. Simons, believing that the driver was under the influence of a controlled substance, asked her to step out of the car and submit to field sobriety tests.[2] Ultimately, Simons arrested the driver for driving under the influence of intoxicants. Meanwhile, defendant remained in the car. She was not ordered out of the car or told to remain in the car.

At some point, Oregon State Police Detective Banks and another officer arrived at the scene. Banks spoke with defendant at the passenger door, in part to see if she was "exhibiting any signs of impairment." He explained that the driver was being arrested and that Simons would come by to explain matters further. Banks did not block the passenger door, place his hand on the door, or tell defendant that she was not free to leave. He also did not ask for her name or request her identification. After arresting the driver, Simons

---

[1] ORS 475.894 provides:

"(1) It is unlawful for any person knowingly or intentionally to possess methamphetamine unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice, or except as otherwise authorized by ORS 475.005 to 475.285 and 475.840 to 475.980.

"(2) Unlawful possession of methamphetamine is a Class C felony."

[2] Ultimately, the driver refused to submit to the field sobriety tests.

asked defendant to get out of the car so that he and Lawson could search the vehicle. Defendant complied.

Banks continued his conversation with defendant after she got out of the car. Although defendant did not appear to be under the influence of controlled substances, Banks was "curious" to see if defendant had illegal drugs on her and asked her if she had any drugs. Defendant replied that she did not. Banks then asked permission to frisk defendant. Defendant told Banks that she did not want to be touched, but turned out her pockets to show Banks their contents. At that point, although Banks had not told defendant that she was not free to leave, he testified that, had she tried to leave, he would not have let her go.

Banks then asked defendant if she would "shak[e] out [her] bra," *i.e.*, pull her bra away from her body to see if any drugs fell out. Defendant complied with that request. Banks next requested permission to search her purse. Without responding, defendant started to rifle through her purse. Banks, fearing that defendant may have had a weapon in her purse, told her to stop and asked again if he could search her purse. Defendant said, "[N]o." Banks then asked defendant, "If I call a drug dog here[,] is he going to alert on your purse?" Defendant told Banks to "[c]all a drug dog."

Banks arranged to have a drug detection dog brought to the scene from The Dalles. He told defendant that a drug dog was en route, but did not tell her how long it would take to arrive. Banks then told defendant that, "if she had a small amount of drugs in her purse and if she was cooperative and provided them to us[,] that she would be treated more than fair." Defendant said "okay," handed her purse to Banks, said that she thought she had some methamphetamine in her purse, and then nodded at the wallet that Banks had removed from the purse. Banks found a small amount of methamphetamine in defendant's wallet.

Defendant was charged with unlawful possession of methamphetamine. ORS 475.894. Before trial, defendant moved to suppress the evidence obtained from the search of her purse and the inculpatory statements she made after giving consent to search. Defendant contended that her consent

and, consequently, the evidence discovered in her purse and wallet, derived from an unlawful seizure in violation of her rights under Article I, section 9, of the Oregon Constitution.[3] The trial court denied defendant's motion, concluding that defendant had never been stopped before she handed her purse to Banks—that is, that the antecedent interaction between defendant and Banks never amounted to more than a "mere encounter"—and that defendant's consent to the search was voluntary. In a subsequent court trial based on stipulated facts, the court found defendant guilty.

On appeal, defendant assigns error to the trial court's denial of her motion to suppress, renewing the arguments she made at trial. The state does not dispute that Banks acted without reasonable suspicion or that, under the analysis of *Hall*, defendant's consent to the search was causally related to Banks's conduct. 339 Or at 34-35 ("After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct."). Rather, the state contends that, because defendant's encounter with Banks amounted only to "mere conversation"—and, thus, was not a stop under Article I, section 9—the evidence and her inculpatory statements were properly admitted. As amplified below, we conclude that, in the totality of the circumstances, regardless of whether defendant had arguably been seized at some earlier point in the encounter, defendant was certainly unlawfully seized at the point that Banks told her that a drug dog had been called to the scene. Accordingly, we reverse and remand.

There are three general categories of encounters between police officers and individuals, two of which amount to "seizures" for purposes of Article I, section 9:

"The first category, 'mere conversation' encounters, encompasses consensual interactions between police officers and citizens that require no justification and that do not implicate Article I, section 9. The second category, temporary

---

[3] Article I, section 9, provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure * * *."

restraints of a person's liberty for investigatory purposes—or 'stop[s]' under ORS 131.615(1) (1995)—constitutes a type of 'seizure' of a person under Article I, section 9, that must be justified by a reasonable suspicion of criminal activity. The third category, arrests, also constitutes a 'seizure' of a person under Article I, section 9, and must be justified by probable cause to believe that the person arrested has committed a crime."

*Hall*, 339 Or at 16-17 (citations omitted; brackets in original). These categories "are guidelines only. They are neither exhaustive nor conclusive as to what police action is a 'seizure' of a person." *State v. Holmes*, 311 Or 400, 407-08, 813 P2d 28 (1991).

■■    In *Holmes*, the Supreme Court distinguished the circumstances that constitute "mere conversation" from those that give rise to an Article I, section 9, seizure. An encounter does not effect a seizure "merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer." *Id.* at 410. Rather, a seizure occurs under Article I, section 9, when a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives a person of his or her freedom of movement or where a person believes that his or her freedom of movement has been so restricted and that belief is objectively reasonable. *Id.* at 409-10. A significant restriction of a person's freedom of movement can occur through physical restraint or a show of authority. *Hall*, 339 Or at 17-18.

■    With those principles in mind and considering the totality of the circumstances in the present case, we conclude that, even if Banks's initial encounter with defendant were "mere conversation," by the time Banks informed her that a drug dog was on its way, the encounter had escalated into a stop. By that time, in succession: (1) Defendant had watched her friend get pulled over, questioned, and arrested. (2) Banks had asked defendant whether she had any drugs on her, and then, apparently not accepting her denial, had asked for consent to frisk her person. (3) After defendant had emptied out her pockets, Banks had asked defendant to "shak[e] out [her] bra," and defendant had done so. (4) Notwithstanding that there was still no evidence that would give

rise to a reasonable suspicion of criminal activity, Banks had twice asked for consent to search defendant's purse—and defendant had twice rebuffed those requests. And (5) Banks had then expressed and confirmed his determination to summon the drug dog.

In the totality of those circumstances, after Banks told defendant that a drug dog was on its way, no objectively reasonable person in defendant's position would have believed that she was free to leave pending the drug dog's arrival. *See, e.g.*, *Hall*, 339 Or at 19 (concluding that "it [is] difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check"). Regardless of the imprecision and uncertainty inherent at the margins of the *Holmes* formulation, the totality of Banks's conduct so transcended "ordinary social intercourse," *Holmes*, 311 Or at 410, as to unambiguously communicate to defendant that a search was bound to occur and that she had no choice in the matter. *See State v. Dahl*, 323 Or 199, 207-08, 915 P2d 979 (1996) (police order to the defendant to come out of his house with his hands up constituted a show of authority, and an unlawful seizure under Article I, section 9, in that it effectively "deprived [the] defendant of any choice in the matter"); *State v. Shaw*, 230 Or App 257, 263, 215 P3d 105 (2009) (officer's request that the defendant come over and speak with him was not a stop where officer did not engage in a show of authority "that would have indicated to defendant that he had no choice but to talk to him").

In sum, we conclude that Banks's conduct of informing defendant that a drug dog was on its way was a show of authority such that any reasonable person would believe that his or her liberty had been intentionally and significantly restrained. Accordingly, defendant had been unlawfully "seized" for purposes of Article I, section 9, by the time that she handed her purse to Banks and indicated that there was methamphetamine inside. As noted, the state does not contend that Banks acted with reasonable suspicion or that defendant's consent to search was causally attenuated from her unlawful seizure under *Hall*. 339 Or at 34-35. Thus, the

trial court erred when it denied defendant's motion to suppress.

Reversed and remanded.