Submitted June 23, 2014, reversed and remanded May 4, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STACEY JEANNINE SEXTON,
aka Stacey Jeannine Ragland,
*Defendant-Appellant.*

Washington County Circuit Court
C120870CR; A152752

378 P3d 83

Peter Gartlan, Chief Defender, and Rond Chananudech, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Jona J. Maukonen, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Egan, Judge.

## ARMSTRONG, P. J.

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine, ORS 475.894, assigning error to the trial court's denial of her motion to suppress evidence obtained after a drug dog alerted to the presence of drugs in a car that defendant owned in which defendant was a passenger. Defendant argues that she was unlawfully seized under Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution, when the car was stopped and again when a police officer walked a drug dog around the car after both defendant and the driver had refused to consent to a search of the car with the dog. We conclude that, under the totality of the circumstances, the officer's conduct did not constitute a show of authority under Article I, section 9, as to defendant such that it turned the ongoing traffic stop of the driver into a seizure of defendant. However, based on the Fourth Amendment, we conclude that defendant was unlawfully seized because the police did not articulate a factual basis for the initial traffic stop, which under the Fourth Amendment was an unlawful seizure of defendant. Accordingly, we reverse and remand.

We review the denial of a suppression motion for legal error and defer to the trial court's findings of fact if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Here, the pertinent facts are undisputed.

On the day of the traffic stop, police were watching defendant's residence for drug-related activity and observed a lot of foot and vehicular traffic coming and going from defendant's home. Deputy Roque saw defendant get into a car as a passenger and, after following the vehicle, observed a traffic violation. Roque relayed that information to Sergeant Cardinal. Cardinal also observed an "equipment violation" on the car and stopped the car for both violations.

Deputy Dipietro arrived about 30 seconds after the initial stop, just as Cardinal was returning to his car to run the driver's information. On his arrival, Dipietro approached the passenger side of the car because he knew defendant

from prior contacts, identified himself, and asked if he could search the car using his drug dog. Defendant told Dipietro that the car was hers and refused to consent to a search. The driver also refused to consent to a search. Dipietro then retrieved his dog and started a drug-sniff walk of the dog around the car, starting at the passenger-side headlight and moving counter-clockwise to the driver's door, where the dog alerted to the odor of drugs in the car. Dipietro then returned the dog to his patrol car.

By that point, Deputy Pelletteri had arrived. Pelletteri asked defendant to get out of the car, based on Dipietro having told him that the drug dog had alerted. As defendant got out of the car and walked over to one of the patrol cars, Pelletteri heard something hit the ground. He saw a syringe at defendant's feet that had not been there before and, unprompted, defendant said, "It's not mine." The syringe tested positive for methamphetamine.

Before trial, defendant moved to suppress all evidence obtained after the traffic stop, including the syringe. At the hearing on the suppression motion, Cardinal testified about his stop of defendant's car:

"[PROSECUTOR]: [W]as Deputy Al Roque involved [in the surveillance of defendant's home]?

"[CARDINAL]: Yes, he was.

"[PROSECUTOR]: Did he relay to you that he observed a traffic violation of some kind?

"[CARDINAL]: He did.

"[PROSECUTOR]: And at some point was a decision made to make a stop on that vehicle?

"[CARDINAL]: Yes, there was.

"[PROSECUTOR]: Did you personally observe your own traffic violation prior to making the stop of that vehicle?

"[CARDINAL]: Correct. I observed an equipment violation."

Roque did not testify at the hearing, and Cardinal did not provide any further testimony about the factual

basis for his stop of defendant's car, except to confirm that the traffic violations were the only basis for the stop. The trial court denied defendant's motion to suppress, concluding that the officers had probable cause to stop the car and did not unlawfully extend that stop with the drug dog.

On appeal, defendant argues that she was unlawfully seized under both Article I, section 9, and the Fourth Amendment and, thus, her suppression motion should have been granted. We turn first to defendant's arguments under Article I, section 9. *See Sterling v. Cupp,* 290 Or 611, 614, 625 P2d 123 (1981) ("The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim.").

Defendant argues that she was unlawfully seized under Article I, section 9, both at the time of the initial stop of the car and at the time that Dipietro began to walk the drug dog around her car. Defendant argues that she was seized at the time of the initial stop because Cardinal stopped the car for an equipment violation, which can be a violation for both an owner and a driver. *See, e.g.,* ORS 815.220(1). As a result, she asserts that "a reasonable owner would not feel free to leave when an officer pulls the car over." Defendant further argues that she was seized at the time of the dog sniff. Relying on *State v. Mathis,* 232 Or App 286, 222 P3d 39 (2009), defendant argues that, when Dipietro retrieved his dog after defendant had refused consent to search with the dog, no objectively reasonable person would have believed that he or she was free to leave pending the arrival of the drug dog.

We review for legal error whether a police officer's interaction with an individual amounts to an unlawful seizure under Article I, section 9. *State v. Smith,* 252 Or App 518, 519, 287 P3d 1210 (2012). The Oregon Supreme Court has divided police-citizen encounters into three categories— "mere conversation," which is a noncoercive encounter with police; "stops," which involve a temporary restraint on a person's liberty; and "arrests," which involve a restraint on a person's liberty and a step toward charging a person with a crime. *State v. Ashbaugh,* 349 Or 297, 308-09, 244 P3d 360 (2010). Stops and arrests require justification to be lawful

under Article I, section 9, while mere conversation does not. *Id.* "The thing that distinguishes 'seizures'—that is, 'stops' and 'arrests'—from encounters that are 'mere conversations' is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Id.* at 309. The test is an objective one:

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred."

*Id.* at 316 (emphasis omitted).

As a starting point, defendant was not seized under Article I, section 9, when Cardinal stopped the car by reason of her being a passenger in the car or her being the owner of the car pulled over for an equipment violation. Under Article I, section 9, passengers in a car stopped by police "without more, have not been 'seized' as a constitutional matter." *State v. Thompkin*, 341 Or 368, 377, 143 P3d 530 (2006); *see also State v. Clemons*, 267 Or App 695, 698, 341 P3d 810 (2014) ("Under Article I, section 9, '[p]assengers in a stopped vehicle—whether lawfully or unlawfully stopped— are not seized merely by virtue of their status as passengers.'" (Quoting *State v. Ross*, 256 Or App 746, 754, 304 P3d 759 (2013).)). A passenger is seized only when there is the imposition, either by physical force or through some show of authority, of some restraint on that individual's liberty. *Ross*, 256 Or App at 752. Here, there was no such show of authority toward defendant at the time of the initial stop. After initiating the stop, Cardinal asked the driver for his identification and proceeded to run that information through dispatch. Nothing in the record indicates that Cardinal interacted with defendant at that time or told defendant or the driver that he was investigating an equipment violation on the car. Thus, the fact that he was investigating an equipment violation on a car owned by defendant is not a "show of authority" as to defendant because no officer "convey[ed] * * * either by word, action, or both that [defendant was] not

free to terminate the encounter." *State v. Backstrand*, 354 Or 392, 401, 313 P3d 1084 (2013).

For defendant to have been seized, the police must have made a "show of authority" after the initial traffic stop that was constitutionally significant as directed at defendant. *State v. Sherman*, 274 Or App 764, 771, 362 P3d 720 (2015). Thus, the question before us on these facts is whether Dipietro seized defendant after the stop, but before the drug dog alerted to the presence of drugs in the car—at which point defendant does not dispute that the officers had justification to detain her. Defendant argues that she was unlawfully seized when Dipietro started to walk the dog around the car after she refused to consent to a search of the car by the drug dog. We conclude that defendant was not seized under Article I, section 9, at that point.

The Supreme Court has explained that police inquiries or requests for cooperation, by themselves, are not searches or seizures under Article I, section 9. *Backstrand*, 354 Or at 403; *see also State v. Rodgers/Kirkeby*, 347 Or 610, 622, 227 P3d 695 (2010) ("[P]olice inquiries during the course of a traffic stop (including requests to search a person or vehicle) are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9."). Rather the officer's conduct must be "something more" than an inquiry or request for cooperation. "The 'something more' can be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Backstrand*, 354 Or at 403.

Here, Dipietro asked defendant for her consent to search the car with the drug dog. In response, both she and the driver refused to consent to a search. Dipietro did not further pressure either occupant of the vehicle for consent, or engage them in further conversation. There was nothing about the inquiry that Dipietro made of defendant that sets it apart from the types of verbal inquires made during stops that do not implicate Article I, section 9. *See, e.g., Ashbaugh*, 349 Or at 316-17 (officer asking the defendant what was in

her purse and whether he could search her purse was not a seizure of the defendant).

The only thing "more" that occurred here is that Dipietro retrieved his dog and proceeded to walk it around the car in which defendant was seated. However, the record reflects that Dipietro started at the front of the car and then proceeded to walk the dog counter-clockwise over to the driver's door, where the dog alerted. At that point, Dipietro returned the dog to his patrol car. Dipietro did not direct defendant to stay in the car (or to leave), never had the dog in front of the door that defendant would have used to leave, and, at all times, was moving the dog further away from where defendant was seated in the car. Nothing in the record suggests that any of the officers' tone, manner, or conduct was threatening or coercive toward defendant or otherwise elevated the encounter to the level of a seizure by conveying to defendant that the officers would not allow her to leave. We thus conclude that Dipietro's request to search the car with the dog and the actual drug sniff that occurred would not lead a reasonable person to believe that Dipietro had intentionally and significantly deprived defendant of liberty or freedom of movement.[1]

Defendant's reliance on *Mathis* as support for a contrary conclusion is misplaced. That case involved coercive circumstances that are not present here. In *Mathis*, the defendant was a passenger in a car that was pulled over for traffic violations. After the driver was arrested on suspicion of driving under the influence of intoxicants, a police officer asked the defendant to get out of the car so that they could search it. Once outside the car, the officer asked the defendant if she had drugs on her and if he could frisk her.

---

[1] In coming to the opposite conclusion, the concurrence places significance on defendant refusing to have the drug dog search her car before Dipietro conducted the drug sniff of the exterior of the car with the dog. However, a request to *search* the car with a drug dog is different from a walking a drug dog around the exterior of the car. The first—a search—is constitutionally significant and requires consent, a warrant, or an exception to the warrant requirement before law enforcement officers may proceed. When defendant refused to consent to a search, Dipietro did not pursue the matter. An exterior dog sniff of a car in a public place is not a search and does not require constitutional justification. *State v. Smith*, 327 Or 366, 374, 963 P3d 642 (1998). Dipietro made no show of authority, by word or conduct, directed at defendant by merely walking the drug dog around the front of the car and to the driver's door.

The defendant refused the request but nonetheless turned out her pockets for the officer. The officer then asked her to shake out her bra, which she did. The officer then twice asked to search the defendant's purse, and both times the defendant refused. The officer then asked the defendant whether, if he called a drug dog, it would alert to her purse. The officer proceeded to arrange for a drug dog to join them and told the defendant that the drug dog was on its way but that, if the defendant had only a small amount of drugs in her purse, she would be treated more fairly if she cooperated. At that point, the defendant consented to a search, and a small amount of methamphetamine was found. *Mathis*, 232 Or App at 288-89.

We concluded that, under the totality of the circumstances, the defendant was seized under Article I, section 9, by the time that the officer told her that a drug dog was on its way. We came to that conclusion because, by that point, the defendant's friend had been arrested; the officer had asked the defendant if she had drugs and would consent to be searched; the officer had asked her to shake out her bra after she had already turned out her pockets; the officer had twice asked to search her purse, which was refused; and the officer had then raised and confirmed with the defendant his decision to call a drug dog. *Id.* at 291-92. Under those circumstances, we concluded that "no objectively reasonable person in defendant's position would have believed that she was free to leave pending the drug dog's arrival." *Id.* at 292.

None of the circumstances that led us to conclude that the defendant had been seized in *Mathis* are present here. The driver was not arrested or removed from the car, the interaction between Dipietro and defendant lasted only a few minutes between his arrival and the drug dog alerting to the car, defendant was not removed from the car before the drug dog alerted, Dipietro asked defendant only once if he could search her car, and he stopped his interaction with her once she refused. Under the totality of the circumstances in this case, nothing about Dipietro's retrieval of the drug dog and subsequent walk around the car escalated the "mere conversation" with defendant to a seizure under Article I, section 9.

Because we conclude that defendant was not seized under Article I, section 9, we turn to defendant's Fourth Amendment argument. Under the Fourth Amendment, defendant was seized for the duration of the stop when Cardinal stopped the car in which she was a passenger. *See, e.g., Clemons,* 267 Or App at 699-700 (discussing Fourth Amendment principles). Thus, our inquiry is different from that under Article I, section 9. For the Fourth Amendment analysis in this case, we must first determine if the stop of defendant was lawful, *viz.,* based on reasonable suspicion. *See, e.g., United States v. Lopez-Soto,* 205 F3d 1101, 1105 (9th Cir 2000) (an officer must have reasonable suspicion to justify an investigative traffic stop).

Under the Fourth Amendment, reasonable suspicion "requires 'some minimal level of objective justification' for making the stop." *United States v. Sokolow,* 490 US 1, 7, 109 S Ct 1581, 104 L Ed 2d 1 (1989). Cardinal testified that he stopped the car for a traffic violation that another officer had personally observed and for an equipment violation that Cardinal had personally observed. However, Cardinal did not testify what the traffic violation and the equipment violation were, and the officer who observed the traffic violation did not testify. As a result, the record is devoid of the necessary facts to support a conclusion that Cardinal had objective, reasonable suspicion to stop the car in which defendant was travelling.

Additionally, the officers lacked reasonable suspicion of a drug crime to support the stop of the car. A person's mere association with a location of suspected drug activity is insufficient to support an objective, reasonable belief that that person is engaged in drug activity. *See United States v. Hernandez,* 149 Fed Appx 705, 707 (9th Cir 2005) (no reasonable suspicion of criminal activity to justify stop when "the officer knew only that defendant was parked late at night at a gas station in a high crime area, and that he exited his truck nervously when the officer shined a spotlight in his car"). The testifying officers did not articulate any other factual basis that could have supported the stop of the car based on a suspicion of a drug crime, and Cardinal testified that he did not initiate the stop on that basis.

Because the officers failed to articulate facts to establish objective, reasonable suspicion to justify the initial stop of the car, defendant was unlawfully seized under the Fourth Amendment, and the evidence obtained as a result of the stop of the car must be suppressed. *Lopez-Soto*, 205 F3d at 1106. Accordingly, we reverse and remand.

Reversed and remanded.

**EGAN, J.,** concurring.

I would conclude that defendant was unlawfully seized under Article I, section 9, of the Oregon Constitution[1] when a police officer walked his drug dog around defendant's car, after the officer asked for consent to use the dog to search the car and the driver and defendant, who was a passenger, had refused to give consent. Because I would conclude that defendant was unlawfully seized under Article I, section 9, and reverse and remand on that state law basis,[2] that would obviate the need to address defendant's arguments under the Fourth Amendment to the United States Constitution. Accordingly, I concur in the result, but on different grounds.

We review the denial of a motion to suppress for legal error and defer to the trial court's findings of fact if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). If the trial court did not make express findings of fact on a pertinent issue and there is evidence from which those facts could be decided more than one way, we presume that the court found the facts in a manner consistent with its ultimate conclusion. *Id.*

I begin with an analysis of defendant's argument under Article I, section 9. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) ("The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim.").

---

[1] Article I, section 9, provides in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

[2] The state does not argue, and I do not conclude, that evidence obtained after the stop was sufficiently attenuated to purge it of the taint of police illegality.

"Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen's liberty with the degree of justification required for the intrusion. At one end of the continuum are mere encounters for which no justification is required. At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed 'stops,' which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not."

*State v. Fair*, 353 Or 588, 593-94, 302 P3d 417 (2013) (citations and footnote omitted).

"The thing that distinguishes 'seizures' *** from [mere encounters] *** is the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010). A "show of authority" is a "precise concept" that requires "a reasonable perception that an officer is exercising his or her official authority to restrain." *State v. Backstrand*, 354 Or 392, 401, 313 P3d 1084 (2013). Put differently,

"a seizure exists only if the officer's conduct would be reasonably perceived as coercive in the sense that it would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens."

*Id.* at 400 (citing *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991)). Therefore, for a seizure to occur "[e]xplicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Id.* at 401-02. That inquiry is objective, and is not concerned with a person's subjective "internalized motivations and feelings." *Id.* at 413.

Given that standard, "'law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or

impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful.'" *Backstrand*, 354 Or at 400 (quoting *Holmes*, 311 Or at 410). "The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." *Holmes*, 311 Or at 410.

Thus, an officer's mere inquiry of an individual is not a seizure. *State v. Highley*, 354 Or 459, 471, 313 P3d 1068 (2013). Rather, something more than just asking a question, requesting information, or seeking an individual's cooperation is required of an officer's conduct. "The 'something more' can be such things as the content or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Backstrand*, 354 Or at 403.

Consistently with the above, under Article I, section 9, passengers in a car stopped by police "without more, have not been 'seized' as a constitutional matter." *State v. Thompkin*, 341 Or 368, 377, 143 P3d 530 (2006). A passenger in a vehicle that has been stopped is seized only when there is the imposition, either by physical force or through some show of authority, of some restraint on that individual's liberty. *State v. Ross*, 256 Or App 746, 752, 304 P3d 759 (2013).

I agree with the majority that, under Article I, section 9, the officers did not seize defendant at the point at which Cardinal stopped the car and spoke to the driver. However, as explained below, I disagree with the majority's conclusion that Dipietro did not engage in a show of authority when he brought the drug dog to defendant's car after defendant denied consent to a search of the car with a drug dog. Consequently, I conclude that defendant was seized at this point.

The state does not argue that this issue—whether defendant was seized when Dipietro brought the drug dog

to the car after she had refused consent—is controlled by *Backstrand*, or the related cases *Highley* and *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013). However, the distinction between this case and those cases provides a useful context for our analysis. In each of the *Backstrand* trio of cases, the Oregon Supreme Court concluded that the defendants who had briefly tendered identification to law enforcement officers in various contexts had not been seized under Article I, section 9. *Backstrand*, 354 Or at 415-17 (concluding that an individual's tender of his identification to an officer in age-restricted store did not result from, nor in itself constitute, a show of authority); *Anderson*, 354 Or at 453-54 (same, in an apartment parking lot following a police raid of a related residence); *Highley*, 354 Or at 473 (same, in an apartment parking lot; additionally, an officer's request to search the defendant's person did not constitute a show of authority). Key to the court's conclusions that the defendants in those cases were not seized was the fact that each of the respective defendant's tender of identification to law enforcement officers represented a "choice to cooperate." *See id.* at 469 (so characterizing the actions of the respective defendants in *Backstrand*, *Highley*, and *Anderson*).

Here, I confront the opposite situation. Defendant chose not to cooperate. That choice factors into the totality of the circumstances presented here and aids in the conclusion that Dipietro's conduct constituted a show of authority for the purposes of Article I, section 9. As noted, Cardinal stopped the car defendant was traveling in, and thereby seized the driver, her companion. Within seconds, a second officer, Dipietro, who defendant knew from previous interactions, directly approached the passenger side of the vehicle where she was seated. He spoke only to defendant, and requested her consent to use a drug dog to search the car. Defendant refused to grant consent to the officer, as did the driver of the car. After defendant's refusal, the officer began circling defendant's car with a 90-pound German Shepherd that, as was later demonstrated, was powerful enough to physically pull Dipietro to the car.[3] I conclude that, at the

_____

[3] The majority contends that there is significance in the fact that Dipietro testified that he asked defendant for consent to use his drug dog to search the car, but did not, in fact, search the car in a constitutional sense, because he

point at which Dipietro retrieved the dog in direct contradiction to defendant's refusal to cooperate, his conduct constituted a show of authority for the purposes of Article I, section 9, because it restrained defendant's movement in a way that transgressed ordinary social boundaries. *Backstrand*, 354 Or at 400.

As noted, the state argues that verbal inquires are not seizures. However, that statement is incorrect because it is overbroad; I stress that only verbal inquires, *without more*, are not seizures. *Highley*, 354 Or at 471. Consistently with that, defendant was not seized when Dipietro requested to search the car with the drug dog. However, in light of the totality of the circumstances, Dipietro's retrieval of the drug dog after defendant and the driver refused his request for consent was "something more" that transformed the encounter into a seizure.

The next question is whether that seizure was not supported by reasonable suspicion of criminal activity—namely, that she had committed a drug crime. In particular, defendant notes that according to Cardinal's testimony, the officers stopped the car only for equipment and traffic violations, not because of a suspected drug-related offense, and that the state did not identify any facts that would give rise to a reasonable suspicion that defendant had committed a drug crime. The state responds that the officers had reasonable suspicion because they had heard reports of drug activity and had observed heavy foot and vehicle traffic at defendant's residence on the day in question and Dipietro recognized defendant from past contacts. I agree with defendant that the officers lacked reasonable suspicion.

A stop "must be justified by reasonable suspicion of criminal activity." *State v. Rodgers/Kirkeby*, 347 Or 610, 621, 227 P3d 695 (2010). Police officers may temporarily restrain or "stop" a person only when they reasonably suspect that

---

only walked the drug dog around the car. 278 Or App at 6. The question here is whether the officer engaged in a sufficient show of authority that a reasonable person would believe that he or she was not free to leave. *Backstrand*, 354 Or at 400. To the extent that that perception here hinges on the distinction between a constitutionally significant search and one that does not rise to that level, I decline to impute to a reasonable person the understanding of such a fine legal distinction.

the person has committed or is about to commit a crime. ORS 131.615(1). A stop is reasonable when, under the totality of the circumstances, "a police officer is able to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime[.]" *Ehly*, 317 Or at 80.

I readily conclude that the officers lacked reasonable suspicion on these facts. We have repeatedly held that "a person's mere presence in a location associated with drug activity is insufficient to support an objectively reasonable belief that that person is engaged in drug activity." *See, e.g.*, *State v. Bertsch*, 251 Or App 128, 134, 284 P3d 502 (2012). Moreover, even if defendant's past contacts with Dipietro were related to drug crimes—a fact not established on this record—such a fact would be of only minimal objective value. *Id.* at 135.

In sum, I conclude that police unlawfully seized defendant when Dipietro brought the drug dog to defendant's car after defendant denied consent to do so and that, at that point, police lacked reasonable suspicion that defendant had committed a drug crime. Consequently, the trial court erred in denying defendant's motion to suppress.

Accordingly, I concur that the case should be reversed and remanded, but based on Article I, section 9, and not on the Fourth Amendment.