Argued and submitted January 6, 2005, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings September 14, 2006

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## ERIKIA MARIE THOMPKIN,
*Petitioner on Review.*

## (CC 0105-33237; CA A116637; SC S51405)

143 P3d 530

Peter Gartlan, Chief Defender, Salem, argued the cause and filed the brief on the merits for petitioner on review. With him on the brief was Peter Ozanne, Executive Director, Office of Public Defense Services. Rebecca Duncan, Chief Deputy Public Defender, filed the petition for review. With her on the petition were Peter Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Carson, Chief Justice,** and Gillette, Durham, Riggs, De Muniz,*** Balmer, and Kistler, Justices.

** Chief Justice when case was argued.

*** Chief Justice when case was decided.

RIGGS, J.

Gillette, J., dissented and filed an opinion, in which Durham, J., joined.

## RIGGS, J.

In this criminal case, we decide whether police officers unlawfully "seized" an automobile passenger under Article I, section 9, of the Oregon Constitution.[1]

During a lawful traffic stop of the vehicle in which defendant was a passenger, the officers requested and retained defendant's identification to conduct a records check. At the time, the officers did not have either a reasonable suspicion of criminal activity on defendant's part or a concern about an immediate threat to officer safety. While one officer ran the records check, a second officer questioned defendant about drugs. That conversation prompted defendant to surrender a pipe used for smoking crack cocaine. A subsequent search of defendant's person produced a small rock of crack cocaine. The state charged defendant with possession of cocaine. The trial court denied defendant's pretrial motion to suppress the state's evidence on grounds that defendant voluntarily surrendered the evidence and that she was not unlawfully detained. The trial court convicted defendant of the charged offense, and the Court of Appeals affirmed that judgment from the bench. *State v. Thompkin*, 192 Or App 364, 87 P3d 709 (2004). We allowed defendant's petition for review, and now, for the reasons that follow, conclude that the officers' interaction with defendant constituted an unlawful seizure under Article I, section 9. We further conclude that the state failed to prove that the discovery of the evidence at issue was sufficiently independent of that preceding violation of defendant's rights; therefore, the evidence must be suppressed. Accordingly, we reverse the decision of the Court of Appeals and the judgment of the trial court.

We take the following facts from the trial court's findings and from the record. At approximately 3:15 a.m. on

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

May 11, 2001, Portland police officers Hill and Reagan were patrolling in a marked police vehicle in Northeast Portland; Hill was driving. While on patrol, Hill observed the driver of a vehicle, in which defendant was the front seat passenger, fail to signal a turn. Hill initiated a traffic stop and approached the vehicle after it had stopped in front of defendant's apartment.

Hill approached the driver's side of the vehicle, while Reagan approached defendant on the passenger's side. Hill spoke to the driver regarding the reason for the traffic stop and asked for identification from both the driver and defendant, which they provided. Hill then returned to the police vehicle to run a records check on the information from each piece of identification, a process that took less than five minutes. During that time, Reagan remained on the passenger side of the vehicle and asked defendant about her activities with the driver that evening. Reagan also asked defendant if she had any drugs or weapons on her person. In response to that question, defendant removed a crack pipe from her pocket and handed it to Reagan.

After Hill returned from running the records checks on the driver and defendant, he gave the driver a verbal warning regarding his failure to signal the turn. Reagan then informed Hill of the crack pipe that he had obtained from defendant. Based on that information, Hill requested that defendant step out of the vehicle and asked her if she would submit to a search. Defendant got out of the vehicle and complied with Hill's request to search her person.

Prior to conducting the search, Hill asked defendant to interlock her fingers behind her head. Defendant complied but kept her left thumb folded into her palm, which prompted Hill to make a second request that she interlock her fingers. Noticing that something was interfering with defendant's ability to interlock her fingers properly, Hill lifted up defendant's thumb on her left hand. At that point, defendant dropped or threw what appeared to be a small rock to the ground where it shattered. Hill observed the substance and believed it to be consistent with crack cocaine. Hill then took defendant into custody and advised her of her *Miranda* rights. A subsequent lab report confirmed that the substance

was cocaine and that the pipe contained cocaine residue. The state charged defendant with possession of cocaine under *former* ORS 475.992 (2001).

Before trial, defendant moved to suppress the evidence of the pipe and the cocaine on grounds that the officers had seized that evidence without statutory authorization and in violation of her state and federal constitutional rights. Defendant argued that her surrender of the pipe had not been voluntary but, rather, had been mere acquiescence to police authority. Alternatively, defendant argued that, even if the action of handing over the pipe could be construed as voluntary, the retaining of her identification to run a records check without reasonable suspicion of criminal activity constituted an unlawful seizure. Defendant contended that Reagan had exploited that illegality to obtain the evidence and, therefore, the evidence should be suppressed.

When asked what prompted defendant to hand over the crack pipe, Reagan testified: "Well, I asked her if she had a crack pipe—or I asked her if she had any drugs or weapons on her, and she handed me a crack pipe from her right pocket." Reagan also testified that he commonly inquires about drugs and weapons and that, at the time that he inquired of defendant, he had no reason to believe that defendant actually possessed such items.[2]

The trial court concluded that the officers had not detained defendant unlawfully by taking her identification because no evidence in the record demonstrated that she otherwise would have left the scene while Hill was evaluating the driver's identification. The trial court found:

"Here[, defendant] was sitting in the car and would have been sitting in the car—on the face of this record, and I so find—while Officer Hill was running [the driver's] identification information. Even if her own [identification] had not been taken, there's no evidence that she would have gotten out of the car or left the scene, that she didn't feel free to

---

[2] In his report of the incident and his testimony to the trial court, Hill stated that defendant was not wearing her seatbelt. The trial court found, however, that neither Hill nor Reagan had seen defendant riding in the vehicle without a seatbelt while it was moving in traffic. Consequently, the trial court concluded that the officers did not have probable cause to detain or cite defendant for a traffic violation.

leave because her ID was there and not because she was waiting there for them to do what they had the right to do while processing a traffic infraction with [the driver]."

Additionally, the trial court found that defendant voluntarily had surrendered the crack pipe and had not done so in response to any threat or promise on Reagan's part. As a result, the trial court denied defendant's motion to suppress the evidence of the crack pipe and cocaine.

Following a trial on stipulated facts, the trial court found defendant guilty of the charged offense, and defendant appealed. On appeal, defendant argued that Reagan's conduct was not authorized by ORS 810.410,[3] which governs officer conduct during a stop for a traffic violation. Relying on Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution,[4] defendant also argued that she unlawfully had been seized without reasonable suspicion of criminal activity when Hill took and retained her identification, thereby rendering her response to Reagan's questioning involuntary and tainting

---

[3] ORS 810.410 provides, in part:

"(3) A police officer:

"* * * * *

"(b) May stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation.

"(c) May make an inquiry into circumstances arising during the course of a detention and investigation under paragraph (b) of this subsection that give rise to a reasonable suspicion of criminal activity.

"(d) May make an inquiry to ensure the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

"(e) May request consent to search in relation to the circumstances referred to in paragraph (c) of this subsection or to search for items of evidence otherwise subject to search or seizure under ORS 133.535."

[4] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 US 643, 655, 81 S Ct 1684, 6 L Ed 2d 1081 (1961).

the evidence as the fruit of an illegal seizure. As noted, the Court of Appeals affirmed defendant's conviction from the bench.

On review, defendant argues that, absent reasonable suspicion of criminal activity or an immediate threat to officer safety, ORS 810.410 and Article I, section 9, do not permit police officers to request and retain a passenger's identification for the purpose of running a records check while conducting a lawful traffic stop of the driver of a vehicle. Consequently, defendant contends, evidence obtained during her unlawful detention must be suppressed because no intervening event broke the connection between the illegality and the discovery of the evidence. Defendant makes similar arguments under the Fourth Amendment.

The state responds that Hill's request for defendant's identification did not amount to a seizure because Hill did not demand compliance or otherwise suggest that defendant was not free to refuse his request. The state characterizes Hill's request for identification as "nothing more than a permissible attempt to obtain defendant's cooperation and assistance." Further, the state continues, running a records check on defendant's identification information did not constitute a seizure because Hill's brief retention of the identification for that purpose did not amount to a significant restriction on defendant's liberty.

■ We begin our analysis by addressing defendant's argument under ORS 810.410, which authorizes certain police conduct during the course of a valid traffic stop. *See State v. Rodriguez*, 317 Or 27, 31, 854 P2d 399 (1993) (court considers subconstitutional issues before constitutional issues); *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court considers questions of state law before those raised under the federal constitution).

In *State v. Amaya*, 336 Or 616, 623-24, 89 P3d 1163 (2004), this court concluded that ORS 810.410(3) authorizes a police officer to inquire into circumstances during a traffic stop that (1) are reasonably related to the traffic violation, ORS 810.410(3)(b); (2) develop during the stop and give rise to a reasonable suspicion of criminal activity, ORS 810.410(3)(c); or (3) help ensure the safety of the officer,

including an inquiry about weapons, ORS 810.410(3)(d). Under the facts of this case, it is clear that the inquiry in question—the request and retention of defendant's identification to run a records check—was not reasonably related to the traffic violation and was not initiated to ensure the safety of the officers. Thus, the only remaining statutory source of authority for the officers' conduct lies in ORS 810.410(3)(c)— that is, did a circumstance develop during the stop that gave rise to a reasonable suspicion of defendant's criminal activity?

The record in this case demonstrates that the answer to that question must be "no." The trial court made no findings that defendant had acted suspiciously, and the state does not argue otherwise. Therefore, based on the record before us, we conclude that the taking and retaining of defendant's identification for the purpose of running a records check, and the subsequent questioning of her concerning drugs, were not authorized by ORS 810.410(3)(c) because the officers lacked "a reasonable suspicion of criminal activity."

Our conclusion that the officers' conduct violated ORS 810.410 does not resolve this case, however, because the legislature has determined that such statutory violations do not provide a sufficient basis to exclude challenged evidence. *See* ORS 136.432 (so stating).[5] We therefore turn to the question whether the officers' conduct was permissible under Article I, section 9, of the Oregon Constitution.

■      Among the potentially "infinite variety of encounters between law enforcement officers and citizens," *State v. Holmes*, 311 Or 400, 406, 813 P2d 28 (1991), this court has identified three general categories of encounters and indicated whether those encounters constitute a "seizure" under Article I, section 9. *Id.* at 406-07. First, "mere conversation" between an officer and a citizen without any restraint of liberty requires no justification and does not violate Article I,

---

[5] ORS 136.432 provides, in part:

"A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution[.]"

section 9. *Id.* at 407. Second, a temporary restraint of a person's liberty for the purpose of investigation—*i.e.*, a "stop"— qualifies as a "seizure" and must be justified by a reasonable suspicion of criminal activity. *Id.* Third, an arrest also constitutes a "seizure" and must be justified by probable cause to believe that the person arrested has committed a crime. *Id.* Additionally, we note here that, as we opined in *Amaya*, all passengers in a vehicle subject to a valid traffic stop have been "stopped" (at least physically) but, without more, have not been "seized" as a constitutional matter. 336 Or at 630. However, "further exercise of coercive authority over the passengers" by officers "may, in certain circumstances, constitute a seizure." *Id.* at 631. As this court held in *Holmes*, a person is "seized" under Article I, section 9, when either (1) a police officer intentionally and significantly interferes with the person's liberty of movement; or (2) the person believes, in an objectively reasonable manner, that his or her liberty of movement has been so restricted. 311 Or at 409-10. That determination requires a "fact-specific inquiry into the totality of the circumstances of the particular case." *Id.* at 408.

Here, the trial court concluded that the officers' interaction with defendant did not amount to a seizure and, therefore, did not implicate Article I, section 9. We are bound by the trial court's findings of historical fact if those facts are supported by constitutionally sufficient evidence in the record; however, we must assess independently whether those findings support the trial court's legal conclusion. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). In light of this court's recent decision in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), we conclude that the trial court's legal conclusion that the officers had not seized defendant for purposes of Article I, section 9, cannot be sustained on the facts of this case.

In *Hall*, this court concluded that a police officer's observations of the defendant's repeated turning to look at the officer's police vehicle and then quickly looking away did not give rise to a reasonable suspicion of criminal activity. Nevertheless, this court determined that the officer's initial actions of stopping his vehicle next to the defendant and motioning with two fingers for the defendant to approach had not interfered significantly with the defendant's liberty of

movement. The court concluded that, even if the defendant had been inconvenienced, the officer's actions had not "constitute[d] a show of authority involving conduct 'significantly beyond that accepted in ordinary social intercourse.' " *Hall*, 339 Or at 19 (quoting *Holmes*, 311 Or at 410). However, the court determined that, when the officer in *Hall* retained the defendant's identification and radioed for a warrant check, "the consensual nature of that encounter dissipated, and the encounter evolved from a 'mere conversation' encounter into a restraint upon defendant's liberty of movement." *Id.* Although the officer in *Hall* promptly had returned the defendant's identification, this court nevertheless concluded that

> "defendant was cognizant that [the officer] was investigating whether defendant was the subject of any outstanding warrants. Although the state insists to the contrary, we find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check. We further observe that, in this case, [the officer] did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until [the officer] had received the results of the warrant check. Instead, immediately upon returning defendant's identification card, [the officer] questioned defendant about whether defendant was carrying any weapons, knives, or illegal drugs, and he asked defendant for consent to search defendant's person."

*Id.* Accordingly, the court held in *Hall* that the defendant had been seized under Article I, section 9, because the restraint imposed during the pending warrant check had not been justified by a reasonable suspicion of criminal activity. *Id.*

The facts at issue here are similar to those in *Hall*. Here, one officer (Hill) requested and retained defendant's identification to conduct a records check, including a check for outstanding warrants. While awaiting the results of that check, another officer (Reagan) questioned defendant concerning drugs and weapons, which prompted defendant to surrender the crack pipe. Here, as in *Hall*, we find it doubtful that a reasonable person in defendant's position would think that he or she was free to leave at a time when that person

was the investigatory subject of a pending warrant check and was being questioned about illegal activity. *See id.* at 19 (so stating). In view of those facts, defendant was unlawfully seized under Article I, section 9, because her liberty of movement was significantly restrained under the totality of the circumstances. *See State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984) (holding that officer's action of retaining defendant's identification cards constituted seizure because it had practical effect of making defendant unable to leave).

Having concluded that defendant was unlawfully "seized" for purposes of Article I, section 9, we must next determine whether suppression of the evidence obtained during that illegality is required. As noted above, the trial court concluded that defendant had voluntarily surrendered the crack pipe in response to Reagan's questioning. Again, *Hall* is the guiding precedent on this issue. In *Hall*, this court reiterated that the Oregon exclusionary rule is not predicated upon a deterrence rationale like its Fourth Amendment counterpart, but is a "constitutionally mandated rule that serves to vindicate a defendant's personal rights." 339 Or at 24. *See State v. Davis*, 313 Or 246, 249, 834 P2d 1008 (1992) (holding that protection against unreasonable searches and seizures under Article I, section 9, includes right "to be free from the use of evidence that has been obtained in violation of the defendant's rights prescribed by that provision"). "Thus, in deciding the applicability of the Oregon exclusionary rule, the critical inquiry is whether the state obtained the evidence sought to be suppressed as a result of a violation of the defendant's rights under Article I, section 9." *Hall*, 339 Or at 24. The methodology of that inquiry was explained in *State v. Johnson*, 335 Or 511, 520-21, 73 P3d 282 (2003), and recently summarized in *Hall*:

> "[A]fter a defendant establishes the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence

through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence[.]"

339 Or at 25 (internal citations omitted). In *Hall*, where the defendant's consent to search followed an unlawful stop, the court recognized several considerations relevant to determining whether exclusion is required to vindicate a defendant's rights under Article I, section 9. *Hall*, 339 Or at 35, 35-36 n 21. Those considerations include: (1) the temporal proximity between the unlawful police conduct and the challenged evidence; (2) the existence of any intervening circumstances—such as the provision of *Miranda* warnings before asking about drugs and weapons; and (3) the presence of any circumstances that mitigated the effect of the unlawful police conduct—such as informing a defendant of the right to refuse to comply with an officer's request. *Id.* at 35. Once a defendant demonstrates a minimal factual nexus between prior, unlawful police conduct and the evidence sought to be suppressed, deciding whether the state has carried its burden requires a fact-specific inquiry into the totality of the circumstances. *Hall*, 339 Or at 35.

Again, the facts at issue here are similar to *Hall*, where the defendant did not spontaneously grant consent to a search but, rather, gave consent in response to the officer's request. There, the officer requested consent to search immediately after the officer had questioned the defendant about weapons and illegal drugs and while the defendant was awaiting the results of a warrant check. 339 Or at 36. Under those circumstances, this court concluded:

"Given the close temporal proximity between the illegal detention and defendant's consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct, we cannot say that the state has proved that defendant's decision to consent, even if voluntary, was not the product of the preceding violation of defendant's rights under Article I, section 9."

*Id.*; *see also State v. Toevs*, 327 Or 525, 537-38, 964 P2d 1007 (1998) (requiring suppression of evidence where defendant voluntarily consented to search during unlawful seizure); *State v. Dominguez-Martinez*, 321 Or 206, 214, 895 P2d 306 (1995) (same). Although *Hall*, as well as the cases that it relies upon, analyzed whether a defendant's consent to search was vitiated by prior, unlawful police conduct, the reasoning in those decisions is equally applicable to this case, where defendant voluntarily surrendered incriminating evidence in response to the officer's questioning during an impermissible seizure. We conclude that, given the close temporal proximity between the illegal seizure of defendant and her surrender of the crack pipe, as well as the absence of any intervening circumstances or other circumstances mitigating the effect of the unlawful police conduct, the state failed to prove that defendant's decision to surrender incriminating evidence, even if voluntary, was not the product of the preceding violation of her rights under Article I, section 9. Consequently, the evidence obtained during the unlawful seizure of defendant must be suppressed.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**GILLETTE, J.,** dissenting.

The majority today regrettably pushes ahead with a line of analysis that the court first articulated as its rationale in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005). That rationale utterly fails to appreciate or give constitutional validity to the defendant's noncoerced consent in this case, just as the majority in *Hall* failed to understand the significance of the defendant's consent there. *See generally Hall*, 339 Or at 37-52 (Durham, J., concurring in part and dissenting in part) (identifying fallacy in majority's treatment of the defendant's consent in that case). "Consent" used to be an event of significant constitutional moment, but the majority's rationale here and in *Hall* robs it of that constitutional significance.

I respectfully dissent.

Durham, J., joins in this dissenting opinion.