BREWER, J.,
concurring in the judgment of the court.
The majority holds that no part of Officer Desmond’s interaction with defendant amounted to a seizure — not his request for identification, not his initial request that defendant submit to a search, and not his persistence in the face of defendant’s obvious reluctance to reveal the contents of containers in his pockets — and that, in consequence, the question of reasonableness does not arise. My analysis of the interaction is different. First, for the reasons explained in my concurrence today in State v. Backstrand, 354 Or 392, 432 313 P3d 1084 (2013), I would conclude that Desmond seized defendant when he requested, examined, and ran defendant’s identification without reasonable suspicion or probable cause to believe that defendant had committed a crime, and that, in the absence of any other articulable basis for taking those actions that would pass constitutional muster, those actions were unreasonable for purposes of Article I, section 9, of the Oregon Constitution. Second, I would accept the trial court’s determination that the initial seizure ended when Desmond returned defendant’s identification to him. Finally, I would confront the question whether an additional seizure occurred when Desmond requested defendant’s consent to search his person. Although I think that the correct answer to that question is “yes,” I must acknowledge that this court’s decision in State v. Ashbaugh, 349 Or 297, 244 P3d 360 (2010), likely compels the opposite conclusion. Accordingly, and solely because Ashbaugh supports — and perhaps dictates — the outcome that the majority reaches, I concur in the majority’s conclusion that there was no unreasonable seizure of defendant for purposes of Article I, section 9. I write separately, however, to express my concerns about that conclusion and its implications.
The first issue to consider is whether defendant was seized when Officer Desmond requested, examined, and ran his identification. The trial court determined that defendant was seized in those circumstances, and I agree. As the *475 majority notes, Desmond, who had followed the car in which defendant was a passenger, knew defendant by name and recognized him from past arrests involving drug activities. After defendant and his fellow passenger returned from the apartment complex, they were “milling around” the car where Desmond was questioning the driver. While Desmond was waiting for a response to his inquiries of the driver’s probation officer, he asked defendant if he was still on probation. When defendant said that he was not on probation, Desmond asked if he could look at defendant’s identification. In those circumstances, it would have been apparent to a reasonable person in defendant’s position that he was the focus of a police investigation related to a possible probation violation, drug activity, or both, and that he must cooperate until the investigation was completed. Accordingly, I would conclude that Desmond seized defendant by requesting, taking, and running through dispatch defendant’s identification.
The next question is when the identification-related seizure ended. The trial court found that that seizure ended when Desmond returned defendant’s identification, and there is evidence to support the court’s determination. In particular, Desmond returned defendant’s identification almost immediately after writing down information contained in it. In addition, Desmond did not tell defendant to wait while he verified defendant’s statement that he was not on probation. When Desmond returned to his patrol car with defendant’s information, there is no indication that defendant perceived that he was being detained. Instead, defendant moved to a different area — near the trunk of his companion’s car — and “milled around.” Finally, when Desmond got back out of his car, he engaged the driver of the car, not defendant, in further conversation, and only later came over to defendant’s location. Under those circumstances, I would conclude that there is evidence to support the trial court’s determination that the initial seizure ended when Desmond returned defendant’s identification.
The remaining issue is whether an additional seizure occurred when Desmond engaged defendant in further conversation and, more specifically, requested defendant’s consent to search his person. Defendant asserts that he was *476 seized when, with the support of a cover officer, Desmond asked defendant if he could search his person or, thereafter, when Desmond “persisted in seeking defendant’s consent to a search greater than defendant appeared willing to allow.” Several recent decisions by this court are pertinent to the resolution of that issue.
State v. Rodgers/Kirkeby, 347 Or 610, 621-22, 227 P3d 695 (2010), involved two challenges to consent searches in the context of initially lawful traffic stops. In Rodgers, this court considered whether the defendant was seized when an officer questioned him about suspicious containers that the officer had observed in the defendant’s car at the end of an otherwise lawful traffic stop. Id. at 627. In concluding that the defendant had been seized, the court first observed that police questioning during a traffic stop by itself does not ordinarily implicate Article I, section 9. Id. at 622. However, the court held that police questioning that is unrelated to the basis for the stop, when combined with an officer’s show of authority, may result in an unauthorized seizure. Id. at 624. Under the totality of the circumstances, the court concluded in Rodgers that the officers’ positions on both sides of the defendant’s car “was a sufficient ‘show of authority’ that, in combination with the unrelated questions concerning the items in the car and the request to search the car, resulted in a significant restriction of [the] defendant’s freedom of movement.” Id. at 627.
Similarly, in Kirkeby, the defendant had been lawfully stopped for investigation of a traffic infraction. Id. In the course of conducting that investigation, the officer asked the defendant for consent to conduct a pat down and, following the pat down, the officer requested consent to examine each of the items that he had detected in the course of the pat down. Id. at 628. Based on the totality of the circumstances, the court concluded that “the deputy’s show of authority that accompanied his request that defendant consent to a patdown and subsequent request that defendant consent to an examination of the contents of defendant’s pockets occurred after the point that defendant should have been issued a citation or sent on his way.” Id.
*477 In resolving the two cases, the court explained that,
“[t]o put the matter another way, constitutionally, Article I, section 9, protects persons and effects from unreasonable searches and seizures by requiring a judicially authorized warrant supported by probable cause authorizing a search or seizure. There are, however, certain limited exceptions to the warrant and probable cause requirements. One such exception permits the police to stop and briefly detain motorists for investigation of noncriminal traffic violations. Police conduct during a noncriminal traffic stop does not further implicate Article I, section 9, so long as the detention is limited and the police conduct is reasonably related to the investigation of the noncriminal traffic violation. However, a police search of an individual or a vehicle during the investigation of a noncriminal traffic violation, without probable cause and either a warrant or an exception to the warrant requirement, violates Article I, section 9. Because police inquiries during a traffic stop are neither searches nor seizures, police inquiries in and of themselves require no justification and do not necessarily implicate Article I, section 9. However, police inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9.”
347 Or at 624.
As the majority points out, Rodgers /Kirkeby involved traffic stops where what amounted to requests to search had occurred after the officers’ authority to detain the defendants had ended. In those circumstances, the court concluded that reasonable people in the defendants’ positions would have inferred that the underlying stops remained in progress and, thus, would feel constrained to cooperate with the officers’ requests. Id. at 622-23. From those decisions, a majority of this court has distilled the principle that “verbal inquiries” generally are not searches and seizures although, in the “distinctive context” of both cases, “the verbal inquiries alone continued the seizures.” Backstrand, 354 Or at 407.
I agree with the majority that it was important to the outcome of those cases that the bases for the stops had *478 ended when the requests to search were made. That said, in my view, those decisions do not compel the conclusion— on which the majority’s reasoning depends — that a police officer’s request for consent to search a person is the sort of “verbal inquiry” that, if made civilly and without any other “show of authority,” passes for mere conversation in a citizen-police encounter. However, as noted, I acknowledge that this court’s subsequent decision in Ashbaugh likely does compel that conclusion.
In Ashbaugh, two police officers approached the defendant and her husband in a public park, took their identifications, and ran a warrant check on both of them. The warrant check revealed an active restraining order between the defendant and her husband, which led the officers to arrest the husband for violating the order. Then, after returning the defendant’s identification to her and leaving her alone for about five minutes while they arrested her husband and placed him in a police car, the officers returned to the defendant’s location and, eventually, asked her for consent to search her purse. The defendant consented, and an officer discovered methamphetamine in the purse.
The court in Ashbaugh acknowledged that its “efforts to explain what the constitutional term ‘seizure’ embraces ha[d] not yet succeeded: Our various explanations, from Holmes to Rodgers/Kirkeby, have left questions unanswered.” Ashbaugh, 349 Or at 310. In attempting to clarify the concept, the court made some progress, but in important respects, it did not finish the job. In particular — and in my view, unfortunately — the court endorsed the fiction that, if made in a civil manner, a request for consent to search a person in the context of an obviously criminal investigation amounts to mere conversation without constitutional significance. In determining whether the officer had made a constitutionally significant show of authority in seeking consent to search the defendant in that case, the court said:
“ [The officer’s] request was not accompanied by any physical action that could be construed as threatening or coercive— he did not, for example, position himself and his fellow officer in a way that would suggest to defendant that she was surrounded.”
*479 Ashbaugh, 349 Or at 317. The court emphasized a trial court finding that the encounter was “relaxed and noncon-frontational,” id., and it minimized the effect of the conced-edly unlawful prior seizure of the defendant arising from the officer’s request for and running of her identification, because “those circumstances had ended.” Id. The court reasoned that
“the officers had returned defendant’s identification to her and left her alone while completing the arrest and transportation of her husband. Thus, while it may have been true that defendant had been unlawfully detained by police some minutes before and had watched a clear show of authority directed at her husband, those circumstances had ended.”
Id. at 317. Ultimately, the court concluded that, “[although it is possible to restrict a person’s liberty and freedom of movement by purely verbal means,” the officer did not do so when he asked the defendant whether she had anything illegal in her purse and if he could search it. Id. at 317. Based on the totality of the circumstances existing when the officers asked the defendant for consent to search her purse, the court concluded that a reasonable person would not have believed that his or her liberty or freedom of movement had been intentionally and significantly restricted and, accordingly, the court concluded that the defendant had not been seized. Id. at 317-18.[1]
*480 With respect, I question each of those premises. Even though, as here, the initial seizure in Ashbaugh had ended before a second, more fruitful, seizure occurred, the entire interaction between the defendant and the officers in Ashbaugh was permeated with the sort of police authority that attends a criminal investigation. There are many circumstances in which police officers should be permitted to inconvenience or even annoy citizens by making “verbal inquiries” or “requests for cooperation” as they conduct investigations of various sorts. Haling passersby to ascertain whether they have witnessed a recent crime is a salient example. However, a line should be drawn where it is apparent from the circumstances that the person being approached is himself or herself the focus of a police investigation. In such circumstances, it is inaccurate to characterize police requests — whether for identification or for consent to search — as mere verbal inquiries. Instead, such requests, however civilly made, ordinarily suggest that the person is suspected of wrongdoing and that he or she must cooperate until the investigation has ended. In fact, that implication is the foundation for most consent searches in which evidence of a crime is found. After all, apart from a sense that the police are in control of the encounter, there is little else to account for a choice that is often certain to lead to the suspect’s arrest and prosecution.[2]
That view is shared by many, if not most, commentators who have considered the issue. Professor LaFave has this to say about consent searches in the context of traffic stops in the present era:
*481 “Yet another technique commonly employed in connection with drug stops disguised as traffic stops is seeking consent to make a search. Usually the officer attempts to get the driver to consent to a search of the vehicle, but sometimes the requested consent will be for search of the person. Requesting consent has apparently become yet another part of the ‘routine’ of ‘routine traffic stops,’ and it is thus not surprising that the cases contain acknowledgments by police about the frequency of this tactic. These requests result in affirmative responses in the overwhelming majority of cases. Guilty or innocent, most motorists stopped and asked by police for consent to search their vehicles will expressly give permission to search their vehicles, resulting in thousands upon thousands of motor vehicle searches of innocent travelers each year. This is apparently attributable to the training police have received in the art of acquiring what will pass for consent, plus the fact that many factors often present in this setting produce an affirmative response.”[3]
Wayne R. LaFave, The “Routine Traffic Stop” from Start to Finish: Too Much “Routine,” Not Enough Fourth Amendment, 102 Mich L Rev 1843, 1891 (2004) (emphasis omitted; internal citations and quotation marks omitted).
According to LaFave, the fiction of consent searches in the traffic stop context has taken its toll on constitutional limits:
“[T]he failure of most courts, when dealing with traffic-stop consent searches, to adhere to the [Terry v. Ohio, 392 US 1, 19-20, 88 S Ct 1868, 20 L Ed2d 889 (1968)] limits on what constitutes a reasonable temporary detention has produced very distressing results. Consent searches are no longer an occasional event by which a crime suspect may advise the *482 police of his or her wishes and for the police to act in reliance on that understanding, but are now a wholesale activity accompanying a great many traffic stops, submitted to by most drivers, guilty or innocent, and resulting in continued interruption of their travels for a substantial period of time while they wait by the roadside as their vehicles are ransacked, a process which beyond question is highly invasive of the dignitary interests of individuals. Certainly the best way to deal with this problem is as in State v. Fort, [660 NW2d 415 (Minn 2003)], which involved a traffic stop for speeding and a cracked windshield. The court quite correctly held that the officer’s ‘consent inquiry * * * went beyond the scope of the traffic stop and was unsupported by any reasonable articulable suspicion,’ [id. at 419,] meaning the evidence obtained via the consent must be suppressed, without regard to whether the inquiry and subsequent search ‘may also have extended the duration of the traffic stop.’”
LaFave, 102 Mich Law Rev at 1892-93 (footnotes omitted).
In the face of mounting concerns about the prevalence of routine consent searches in traffic stops, some state courts have increasingly looked to their own state constitutions to set more meaningful limits on police activity during traffic stops. Some of those courts have interpreted their state constitutions to flatly forbid the police from posing questions or requests that are unrelated to the underlying reason for the traffic stop, unless the questions or requests are supported by particularized reasonable suspicion to believe that the accosted person has committed or is committing some other crime.[4] Another state court has interpreted its constitution to allow officers to engage in some degree of unrelated questioning, even in the absence of articulable suspicion, but not if the officer’s questions or requests change the fundamental nature of the stop. State v. McKinnon-Andrews, 151 NH 19, 846 A2d 1198, 1203 (2004). And New York has imposed a similar requirement as a matter of state common law. See People v. Hollman, 79 NY2d 181, 590 NE2d 204 (1992) (holding that reasonable suspicion *483 was required before narcotics officers could approach a passenger in a bus terminal and ask for permission to search the person’s bag).
In my view, those courts have struck a better balance than have we in protecting citizens from unwarranted government intrusion. When, in the absence of reasonable suspicion of criminal activity or some other articulable justification, police officers apprehend criminals in the course of a so-called consent search, it is tempting to welcome the result; but we do so at the expense of the liberty interests of all people. It is unsatisfying to reply that law-abiding citizens have nothing to fear from requests for consent to search their persons that are not animated by an articula-ble justification. They do, if they value their right to be free from unreasonable intrusion. Moreover, the bar for a seizure based on reasonable suspicion that criminal activity is afoot or some other articulable justification is not so high that police are unable to adequately enforce the law, interdict crime, perform statutory caretaking functions, and protect their own safety in the absence of authority to seek consent to conduct groundless searches. See, e.g., State v. Ehly, 317 Or 66, 80, 854 P2d 421 (1993) (“[I]f a police officer is able to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime, the officer has ‘reasonable suspicion’ and hence may stop the person for investigation.”).
Here, defendant was a passenger in a vehicle whose driver was being investigated for suspicion of driving while suspended, but an obviously broader police purpose to uncover evidence of criminal activity animated the encounter. Defendant, a passenger, was briefly seized when Desmond requested, examined, and ran his identification. As discussed, that seizure ended before Desmond next approached defendant. In the meanwhile, defendant was free to leave, but he was apparently waiting — as most passengers would — for Desmond to conclude his business with the other occupants of the vehicle so that they could leave together. After telling defendant that he had verified that defendant was no longer on probation, Desmond nevertheless asked defendant for consent to search his person. By that time, a cover officer *484 also was “present.” In response to the search request, defendant agreed to empty his pockets. From that point forward, the futile “cat and mouse” gambit that the majority recounts ensued, wherein defendant attempted to delay the discovery of the drugs in his pocket while Desmond, politely but persistently, refused to let things go.
In my estimation, Desmond’s request to search defendant constituted a seizure under Article I, section 9, because that action, viewed in light of Desmond’s previous inquiry concerning defendant’s probation status and his request for defendant’s identification, communicated to defendant for a second time that he was the focus of an active police investigation and therefore was obligated to cooperate until Desmond concluded his investigation. Irrespective of whether defendant was a motorist or a passenger,[5] such an intrusive and focused inquiry would not be acceptable in an ordinary social interaction. For those reasons, if writing on a clean slate, I would conclude that Desmond’s actions in seeking defendant’s consent to search his person significantly interfered with defendant’s freedom of movement. I would further conclude that an objectively reasonable person in defendant’s position would believe that Desmond had done so. Accordingly, I would conclude that Desmond’s request for consent to search defendant amounted to a seizure for purposes of Article I, section 9, of the Oregon Constitution.[6] Because there was no articulable justification for the seizure, I also would conclude that it was unlawful.
*485 I hasten to add that I can envision circumstances wherein an officer’s request for consent to search a suspect that is unsupported by an articulable justification would not result in an unlawful seizure. If, for example, the officer were to make it clear to a suspect that he or she need not comply with the request and is free to leave, and the officer’s actions or actions of other officers on the scene did not convey a different message, then the show of police authority that is otherwise inherent in such a request might be sufficiently dissipated so as to dispel the conclusion that an unlawful seizure had occurred.[7] However, there is no indication in the record that such a disclaimer was made in this case, so there is no occasion to further consider that issue here.
Finally, because the state does not dispute that there was a connection between Desmond’s request to search and defendant’s consent, I also would conclude that the discovery of the contraband in his possession was the product of an unlawful seizure.[8] However, this court’s decision in Ashbaugh settles those issues in a different way. Accordingly, based solely on a proper respect for the principles of stare decisis, I respectfully concur in the judgment of the court.

 In a separate dissent, Justice Walters questioned the majority’s failure to address and distinguish several of this court’s significant previous decisions, including State v. Hall, 339 Or 7, 19, 115 P3d 908 (2005), where this court concluded that police had seized the defendant when they took his identification for a warrant check, because a reasonable person in that situation would believe that his or her freedom of movement had been restricted. Ashbaugh, 349 Or at 321 (Walters, J., dissenting). To its credit, the majority here has attempted to distinguish Hall and other earlier decisions from the circumstances of this case. However, it is in Ashbaugh that this court crossed an important line by treating consent search requests like the one here as “mere conversation,” a “verbal inquiry,” or an insufficient “show of authority” to significantly restrict its subject’s freedom of movement. Although it is always possible to highlight factual differences between any two cases, the differences between the circumstances in Ashbaugh and those present here are not constitutionally significant to me. I sympathize with the impulse to make such distinctions, but it is unrealistic to expect officers and citizens in the field who must make split second consent requests and decisions, to rely on such shades and subtleties. In my view, we need to recognize Ashbaugh for what it stands for, not try to distinguish our way around it.

 There are multiple possible explanations, but none suggests that what is going on is truly voluntary. As Professor Whorf puts it:
“There are plausible explanations for the ready acquiescence to search by the ‘guilty’: 1) the overall coercive nature of the routine traffic stop turned consent search; 2) the technique of catching the motorist off-guard by the quick transition from traffic stop to contraband investigation; 3) the possible belief by consentors that well-concealed contraband will not be found; 4) the possible belief by consentors that if they readily acquiesce, police suspicion will be dispelled resulting in a cursory search or in no search at all; and 5) the likely belief by consentors that, if they refuse consent, police suspicion will be heightened resulting in a forcible search.”
Robert H. Whorf, Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique, 28 Ohio NU L Rev 1, 22 (2001).

 In the words of Professor Whorf:
“The ‘right’ technique is by now well-established and is likely a frequent subject of law enforcement training in ‘drug interdiction.’ It goes like this: A police officer stops a vehicle for a routine traffic violation such as speeding; the police officer asks the driver to get out of the vehicle; the police officer chats in a friendly way with the driver and, sometimes, with passengers as well; the police officer issues a warning rather than a citation for the traffic offense; the police officer asks if the vehicle contains anything illegal; and then, right on the heels of the inevitable denial, the police officer asks for permission to search the vehicle.”
Whorf, 28 Ohio NU L Rev at 2-3.

 State v. Washington, 875 NE2d 278, 282-83 (Ind App 2007); Fort, 660 NW2d at 418-19; State v. Elders, 192 NJ 224, 927 A2d 1250, 1260-61 (2007); State v. McClendon, 350 NC 630, 517 SE2d 128, 132 (1999); see also State v. Quino, 74 Haw 161, 840 P2d 358, 363-64 (1992) (applying a similar rule to a nonmotor vehicle investigative stop).

 We generally construe the initial detention of passengers in a traffic stop as merely incidental to that of the driver. See State v. Thompkin, 341 Or 368, 377, 143 P3d 530 (2006) (holding that a passenger in a lawfully stopped vehicle is not automatically seized within the meaning of Article I, section 9, but a “further exercise of coercive authority over the passengers by officers may, in certain circumstances, constitute a seizure”). It is unnecessary to challenge that assumption here, but I note that there is an emerging appreciation that, as a practical matter, it can he erroneous. See, e.g., Erica Flores, Comment, “People, Not Places”: The Fiction of Consent, the Force of the Public Interest, and the Fallacy of Objectivity in Police Encounters with Passengers During Traffic Stops, 7 U Pa J Const L 1071, 1080 (2005). The holding in Thompkin also likely is inconsistent with United States Supreme Court decisions holding that, for purposes of the Fourth Amendment, a traffic stop entails the seizure of the vehicle’s passengers. See Arizona v. Johnson, 555 US 323, 129 S Ct 781, 172 L Ed 2d 694 (2009); Brendlin v. California, 551 US 249, 127 S Ct 2400, 168 L Ed 2d 132 (2007).

 Accordingly, I would not reach defendant’s alternative argument that Desmond’s ensuing persistent efforts to obtain consent constituted an unlawful seizure.

 On. remand from the United States Supreme Court, the Ohio Supreme Court in State v. Robinette, 80 Ohio St 3d 234, 685 NE2d 762, 771 (1997), found that a motorist’s consent to search was involuntary under the Ohio Constitution. The court emphasized that it did not adopt a per se requirement that all motorists must be informed of their right to leave, but it held under the totality of the circumstances in the case before it, including the officer’s failure to so inform the defendant, that the consent was invalid. Id.

 The attenuation analysis has been especially problematic for this court when it comes to “consent” searches. In Ashbaugh, three concurring justices were of the opinion that the defendant’s voluntary consent provided an independent basis for affirming the trial court’s judgment in that case. Ashbaugh, 349 Or at 318-20 (Durham, J., Kistler, J., and Linder, J., concurring). That view was based on the defendant’s stipulation that her consent was voluntary. Id. at 319. Here, the majority makes a similar, but not identical point, by indicating that defendant has not challenged the voluntariness of his consent. 354 Or at 470-71, 471 n 3). Although that may be true in a narrow sense, in a broader sense, the entire point of defendant’s argument is that his consent was invalid because it was the direct product of an unlawful request for consent. In his briefs before this court and the Court of Appeals, defendant repeatedly has made such assertions. That is, defendant does not deny that he said “yes”; instead he asserts that, under the circumstances, “no reasonable person would feel free to refuse their cooperation, thus resulting in the person’s seizure, especially considering that the officers neither said nor did anything that would dispel such reasonable belief.” Accordingly, I would not hinge any part of the analysis in this case on the premise that defendant has not challenged the voluntariness of his consent.